UNITED STATES v. EIGHTEEN PACKAGES OF DENTAL INSTRU-
MENTS.

(Circuit Court of Appeals, Third Circuit.　March 6, 1916.　Rehearing Denied
April 11, 1916.)

No. 1965.

1. CUSTOMS DUTIES ☛130—VIOLATIONS OF CUSTOMS LAWS—FORFEITURE.

Act Aug. 5, 1909, c. 6, § 28, subsec. 9, 36 Stat. 97, provides that if any
consignor, etc., shall attempt to enter or introduce into the commerce of
the United States any imported merchandise by means of any fraudulent
or false invoices, or any false statements, or any false or fraudulent prac-
tice or appliance, or shall be guilty of any willful act or omission by
means whereof the United States shall or may be deprived of the law-
ful duties accruing thereon, such merchandise shall be forfeited. *Held*
that, where a consignor of merchandise sent by parcels post attempted by
means of a false invoice undervaluing the merchandise to enter and in-
troduce it into the commerce of the United States, such merchandise was
subject to forfeiture, though there was no formal entry or custom house
proceeding, as the consignor's attempt to introduce the goods into the
commerce of the United States was the statutory cause of forfeiture, and
the consignor or the forfeiture to which his conduct subjected an im-
portation was not affected by the course the goods thereafter followed,
or whether the consignee received them through the customs office or
through the post office.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 296–315;
Dec. Dig. ☛130.]

2. TREATIES ☛11—OPERATION AS TO INCONSISTENT LAWS.

A statute, equally with a treaty, is a law, and, if subsequent to and con-
flicting with the treaty, supersedes it.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 11; Dec. Dig.
☛11.]

3. TREATIES ☛11—INCONSISTENT LAWS—VIOLATIONS OF CUSTOMS LAWS.

The parcels post convention with Germany of September 2, 1899, pro-
vides that merchandise packages must be wrapped or inclosed so as to
permit their contents to be easily examined by customs officers and post-
masters authorized to do so, that they shall be subject in the country of
destination to all customs duties and customs regulations in force
therein for the protection of the customs revenues, and that the sender of
each package must make a customs declaration upon a prescribed form.
*Held*, that this in no way prevents the application to merchandise im-
ported from Germany by parcels post of Act Aug. 5, 1909, c. 6, § 28, subsec.
9, relative to the forfeiture of merchandise which the consignor attempts
to enter or introduce into the commerce of the United States by means of
any fraudulent or false invoice, etc.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 11; Dec. Dig.
☛11.]

Appeal from the District Court of the United States for the Eastern
District of Pennsylvania; Oliver B. Dickinson, Judge.

Proceeding by the United States against Eighteen Packages of Den-
tal Instruments, claimed by Samuel Rubin.　From a decree dismissing
the libel (222 Fed. 121), the United States appeals.　Decree vacated,
libel reinstated, and cause remanded.

☛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Edward S. Kremp, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia Pa., for plaintiff in error.

Walter Evans Hampton, of New York City, for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. Generally speaking, this case involves two questions. Stated in a general way, the first is whether fraudulent importations by parcels post are subject to the same forfeitures as custom house deliveries, or, stated specifically:

"Whether a libel for forfeiture which does not aver a formal entry and subsequent custom house proceedings, but which sets forth in detail an attempt on the part of the consignor to introduce into the commerce of the United States, by parcels post, certain merchandise by means of fraudulent and false invoices, by means whereof the United States would have been deprived of its lawful duties on such merchandise, is insufficient under subsection 9 of section 28 of the act of August 5, 1909."

Stated in a general way, the second question is whether the parcels post convention of 1899, made by this government with Germany, exempts parcel post importations from the forfeitures provided by a subsequent act of Congress, or, stated specifically:

"Whether subsection 9 of section 28 of the act of August 5, 1909, providing, inter alia, for the forfeiture of merchandise if the consignor shall attempt to introduce it into the commerce of the United States by means of fraudulent or false invoices, by means whereof the United States may be deprived of any portion of its lawful duties, applied to merchandise mailed from Germany to the United States under the parcels post convention of September 2, 1899."

The cause arose on a libel filed by the government to forfeit certain packages of dental instruments sent by parcels post from Germany to Philadelphia. Exceptions to the libel were filed by the claimant. Simply as a matter of administration, it might perhaps have been better to overrule the exceptions without prejudice to the claimant's right to renew them in any appropriate form after a trial had settled such questions of fact as might turn out to be in dispute. In this way the whole controversy would have been disposed of more speedily, and the possibility of a second appeal avoided. But, no doubt for reasons that seemed good and controlling, the court below preferred to decide the case solely upon the exceptions. As we are obliged to differ from its conclusion, the case must go back, and therefore may reach us again on a second appeal.

[1] The exceptions to this libel having been sustained by the court below, the libel was dismissed, whereupon the government took this appeal. As amended the libel averred—and for the purposes of this cause we must assume them true—that in April and May, 1913, Edwin Hager consigned by parcels post from Düsseldorf, Germany, 18 packages of dental instruments addressed to Samuel Rubin, Philadelphia, Pa.; that invoices were mailed with the several packages, which made untrue and fictitious statements as to the values of the instruments, such values being the alleged prices at which the instruments were purported to have been sold; that the values thus alleged were $187.02

less than the true dutiable values of the instruments; that Hager sent to Rubin—

"* * * invoices in which the values of the said merchandise was stated correctly and truly; that in addition to the false invoices marked, as aforesaid, with the said packages, Hager mailed duplicates of said invoices directly to said Samuel Rubin."

The libel further averred that Hager—

"* * * did fraudulently and knowingly, as consignor, attempt to enter and introduce into the commerce of the United States, to wit, by parcels post, at the port of Philadelphia, in the state of Pennsylvania, the said dental instruments, by means of fraudulent and false invoices, to wit, by invoices which then and there contained untrue and fictitious statements as to foreign market and true dutiable values, and by means of which the United States would be deprived of a portion of the lawful duties accruing upon the said dental instruments."

It is conceded that, if such goods had entered the United States in due course through the usual custom house channels, they would have been subject to forfeiture under the provisions of subsection 9 of section 28 of the act of August 5, 1909 (36 Statutes, 97, c. 6), quoted below:

"That if any consignor, seller, owner, importer, consignee, agent, or other person or persons, shall enter or introduce, or attempt to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, affidavit, paper, letter, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or persons, shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates; and such person or persons shall, upon conviction, be fined for each offense a sum not exceeding five thousand dollars, or be imprisoned for a time not exceeding two years, or both, in the discretion of the court."

It is contended, however, that this section only relates to custom house entries, and not to parcels post. At this point we note that the statutory forfeiture on which this libel is based is an attempt by a consignor to fraudulently introduce merchandise into the commerce of the United States. It is true the libel points out—as in fairness it should for the information of the consignee—certain steps the consignor took. But these facts are not the statutory cause of forfeiture, but incidents or evidence to establish that the consignor was guilty of the forfeiture act, which was a fraudulent attempt to introduce merchandise into the commerce of the United States. It is also to be noted that an attempt by a consignor to fraudulently introduce into commerce was a new cause of forfeiture, which was only made such by the act of 1909.

As showing the wider scope and effect of that act to stop the fraudulent importations possible under earlier tariff laws, it suffices to quote what the Supreme Court said in United States v. 25 Packages of Hats, 231 U. S. 360, 34 Sup. Ct. 64, 58 L. Ed. 267:

"The prior Tariff Act (26 Stat. 131) provided for the forfeiture of goods 'if any owner, importer, consignee, agent or other person shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice.' In several cases arising under that act it was held that the language used did not cover the case of fraud by the consignor, nor could the goods be forfeited for the wrongful conduct of any person if the act preceded the making of the documents or taking any of the steps necessary to enter the goods. United States v. 646 Half Boxes of Figs [D. C.] 164 Fed. 778 (1908); United States v. One Trunk [D. C.] 171 Fed. 772 (July, 1909). Under the statute, as thus construed, there was no penalty for the grossest fraud on the part of the consignor, notwithstanding the fact that his invoice valuation was of great importance in determining true value, as a basis for collecting the duty. And even if the consignor was also consignee it had been held that there was a locus pœnitentiæ, so that he might, before entry, substitute a true for a false invoice and thus escape a forfeiture.

"In order to close these loopholes and to make the act more effective, Congress, on August 5, 1909 (36 Stat. 11, 97, c. 6), changed the law so as to increase the number of persons whose fraud should be punished. It also enlarged the scope of conduct for which the goods should be forfeited. Instead of punishing only for the fraud of the 'owner, importer, consignee and other persons,' as under the act of 1890, provision was made for forfeiture for fraud of the 'consignor or seller.' Instead of punishing only for entering or attempting to enter on a fraudulent invoice, it punished an attempt by such means 'to introduce any imported merchandise into the commerce of the United States.' This latter phrase necessarily included more than an attempt to enter; otherwise, the amendment was inoperative against the consignor, against whom it was specially aimed, for he does not, as such, make the declaration, sign the documents, or take any steps in entering or attempting to enter the goods. When he makes the false invoice in a foreign country there is no extraterritorial operation of the statute whereby he can be criminally punished for his fraud. But when the consignor made the fraudulent undervaluation in the foreign country and on such false invoice the goods were shipped and arrived consigned to a merchant in New York, the merchandise was within the protection and subject to the penalties of the commercial regulations of this country, even though the consignor was beyond the seas and outside the court's jurisdiction.

"It was argued that the goods could only be forfeited for the same acts that would support an indictment, and inasmuch as the consignor could not be prosecuted here for making a false invoice in a foreign country, neither could the goods be forfeited for the same conduct in the same place. But while punishment for the crime and forfeiture of the goods will often be coincident penalties, they are not necessarily so, nor is there any inconsistency in proceeding against the res if the wrongdoer is beyond the jurisdiction of the court. The very fact that the criminal provision of the statute does not operate extraterritorially against the consignor would be a reason why the goods themselves should be subjected to forfeiture on arrival here."

Seeing, then, that the statutory forfeiture in this libel is what Hager, the consignor, and not what Rubin, the consignee, did, it necessarily follows that when the goods, fraudulently undervalued and consigned by Hager, arrived at Philadelphia, the port of entry, there was then, to use the language of the Supreme Court quoted above, "an attempt to introduce them into the commerce of the United States." What course the goods thereafter followed, whether Rubin received them through the custom office or through the post office, in no way affected Hager or the forfeiture to which his conduct had already subjected the attempted importation. If Rubin never claimed or received the goods, they could have been forfeited just the same for Hager's fraudulent attempt. Indeed, it is conceded that, if the goods had been con-

signed through custom house channels, they could have been subjected to the statutory forfeiture imposed by the section quoted of the act of 1909. But to our mind there is no more reason for applying that section to custom house than there is to post office importations. Neither one of these government agencies is mentioned in the section. The loss of duties by the government is the same, whether the fraudulent attempt is effected by entry through either channel.

Moreover, there is no reason why the government should limit such dutiable importations to its custom house, when it has extended its mail facilities to carrying merchandise parcels. The fact that this statute does not mention custom houses shows that no limitation was intended, and the statute's inclusive character is indicated by the provisions that it applies to *"any consignor,* seller, owner, importer, consignee, agent, or other person"; that it covers any attempt to introduce "into the commerce of the United States *any* imported merchandise"; that the fraudulent attempt to introduce may be done "by means of *any* false statement, written or verbal"; or "by means of any false or fraudulent practice or appliance whatsoever"; or when the person offending "shall be guilty of *any* willful act or omission by means whereof the United States shall or may be deprived of the lawful duties, or any portion thereof." Deprivation of duties is the mischief sought to be remedied, and forfeiture for an attempt to fraudulently introduce into commerce is the punitive remedy provided. Indeed, as it seems to us, there is no reason why the United States should restrict this statutory self-protective statute to custom house entries, and there is every reason why it should cover the post office system. The extension of the parcels post evidenced a governmental purpose to make its mail system an agency and its post offices places for merchandise delivery. And if the facilities of the post office system are extended by law to consignments of domestic merchandise and by treaty to foreign merchandise, there is no reason why, with the benefit conferred, there should not be imposed such statutory regulations as will prevent post office as well as custom house facilities from being used to defraud the government of the duties which it has imposed on all foreign merchandise introduced into the commerce of the country.

When the act of 1909 was passed, the government had already by its practices and regulations adopted the post office as a recognized agency for the importation of foreign merchandise. For example, article 775 of the Treasury Regulations of 1908, provides:

"Dutiable articles are admitted to the mails exchanged under the various parcels post conventions on the following conditions, viz.: 'The parcels must be so wrapped or inclosed as to permit their contents to be easily examined by customs officers and postmasters duly authorized to do so; the customs declarations provided for by the conventions must contain accurate statements of the contents and value of parcels and be securely attached thereto; the parcels to be subject in the country of destination to customs duties, and to the regulations in force for the protection of the customs revenue, and must conform to the following conditions as to value, weight,'" etc.

Other regulations are referred to in the opinion of the court below, where it is said:

"Customs officers are detailed for service at the post offices and meet the mails on arrival. By T. D. 21698, in 1899, such officers were required to correct the valuations when inadequate or supply them when omitted. Forms for this purpose are provided. Article 775 of the Customs Regulations of 1908 required accurate statements of contents and valuations. Article 815 exempted goods from seizure for undervaluations unless the packages contained cigars or cigarettes. Subsequently formal entry was required in certain cases. In 1909 parcels were limited to a value of $80 and entry required where the foreign market value exceeded that stated by more than 25 per cent., or where the value exceeds $100."

Our answer to the first question must therefore be that the averments in the libel were sufficient.

[2, 3] We turn next to the second question. The postal convention with Germany was made in 1899. The act in question was passed in 1909. It is settled (Horner v. United States, 143 U. S. 570, 12 Sup. Ct. 522, 36 L. Ed. 266) that a statute, equally with a treaty, is a law, and, if subsequent to and conflicting with the treaty, supersedes it. But in this case there is no necessity for invoking that principle, for there is nothing in the treaty which in any way limits the power of either country to enact its own tariff legislation. On the contrary, the treaty evidences the desire of each country sending merchandise by post to subject it to the customs regulations of the other. For example, article II, after providing for the receipt of merchandise packages, provides it—

"must be wrapped or inclosed so as to permit their contents to be easily examined by customs officers and by postmasters duly authorized to do so."

And article IV says:

"The packages in question shall be subject in the country of destination to all customs duties and all customs regulations in force in that country for the protection of its customs revenues."

And article V provides:

"The sender of each package must make a customs declaration, upon a special form provided for the purpose (see Form 1, A, annexed hereto), giving the address, a general description of the parcel, an accurate statement of the contents and value, date of mailing, and the sender's signature and place of residence, which declaration must accompany the parcel to destination."

This view, namely, that each signatory to this postal convention was in no way to control the customs regulations of the other, is in accord with the subsequent practice of the signatories thereto. Such practice is evidenced by the instructions issued by our own Post Office Department (United States Official Postal Guide, July, 1915, page 99), which provides:

"The Department has not been advised what articles (other than those so designated in the preceding list of 'prohibited articles') are liable to customs duties in foreign countries, and consequently does not exclude articles of merchandise from the regular mails for foreign countries because they may be liable to customs duties in the countries to which they are addressed. They are accepted at the sender's risk. Any country may refuse to deliver dutiable articles received in mails from other countries, and may dispose of them in accordance with the customs regulations of that country.

"The question whether or not an article sent by mail from one country to another is subject to customs duty in the latter country can be decided only

by the country to which the article is sent, and is not affected by any postal convention between said countries. This Department is not authorized to question the decision of foreign officials in such matters any more than foreign officials would be authorized to question the decisions of United States officials respecting the liability to United States customs duty of an article received here in mails from abroad."

It follows, therefore, that the second question must be answered in the affirmative, namely, that section 9 of the act of 1909 applies to merchandise mailed from Germany to the United States under the postal convention of 1899 between those countries. Such being the case, it follows the court erred in sustaining the exceptions and dismissing the libel.

Its decree will therefore be vacated, the libel reinstated, and the cause remanded for further procedure.